**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| L.P., by and through his Next Friend, TENYIAH PATTERSON, et. al. | ) | |
| | ) | |
| Plaintiffs, | ) | No: 15-cv-11236 |
| v. | ) | |
| | ) | Honorable Manish S. Shah |
| MARIAN CATHOLIC HIGH SCHOOL, et.al. | ) | |
| Defendants. | ) | |

## PLAINTIFFS' COMBINED RESPONSE TO ALL DEFENDANTS' MOTIONS TO DISMISS

NOW COME the Plaintiffs, L.P., by and through his Next Friend, TENYIAH PATTERSON,

J.H., by and through his Next Friend, NIKIA CANNON, I.J., by and through her Next Friend,

JANICE STEVENSON, J.B., by and through her Next Friend, SHARON FRY, C.C. by and

through his next friend RHONDA CAMPBELL, SHANE RATKOVICH, and J.R., by and

through his Next Friend and parent Michele Robinson, through their attorney, Mary J. Grieb of

the Shiller Preyar Law Offices, with the instant combined response to Defendants' Marian

Catholic High School, Joanna Drackert, and Omega Laboratories' motions to dismiss, and in

support, state as follows:

### I.    Introduction, Facts from the Complaint, and Procedural Background

Plaintiffs have alleged plausible claims under several constitutional and federal

provisions, and under Illinois law, arising from the harsh consequences and unfair practices they

endured after receiving false-positive drug test results, from tests administered by Marian

Catholic High School and Omega Laboratories. Marian Catholic High School had a mandatory

drug testing program due only to the fact that it applied for, and received, a federal grant from

the United States Department of Education to run exactly such a program for the Safe and Drug

Free Schools and Communities program. Allowing MCHS to use taxpayer money to administer a

mandatory program to conduct suspicionless (and flawed) drug tests on all its high school students, without requiring MCHS to meet constitutional safeguards against racial discrimination and in favor of equal protection and due process, flies in the face of the purpose and policy behind the various federal civil rights statutes at issue in this lawsuit. In their motions to dismiss, Defendants' attempts to hold Plaintiffs to a fact-pleading standard, or any standard other than plausibility, are unpersuasive. Plaintiffs' claims should not be dismissed.

Beginning in 2008, Marian Catholic High School ("MCHS") and then the Dominican Sisters of Springfield ("Dominican Sisters"), which owns and operates MCHS, began receiving federal grants. 1AC, Paras. 10-11. In 2008, MCHS received the grant for $84,110 for a school based student drug testing program. *Id.* In 2009 and 2010, Dominican Sisters applied for and received grants for $149,831 and $84,878, respectively, from the United States Department of Education for a Safe and Drug-Free Schools and Communities program. *Id.* at Paras. 12-13. In 2011, Dominican Sisters received a federal grant from the U.S. Department of Justice. *Id.* at Para. 14. To date, both Dominican Sisters and MCHS continue to receive federal funding and use federal funding to pay for the drug testing program at MCHS. *Id.* at Para. 15. MCHS is a nonpublic, nonprofit secondary school registered with and recognized by the Illinois State Board of Education and operating in Cook County, Illinois. *Id.* at Paras. 7-8. By registering with the State of Illinois, MCHS enjoys certain benefits and assures compliance with nondiscrimination laws, among other requirements. *Id.* at Para. 8. MCHS is also a member of the Illinois High School Association and participates in the President's Education Awards Program, a federal program. *Id.* at Para. 16. MCHS advertises to and enrolls students from the Chicago, Illinois and northwest Indiana areas. *Id.* at Para. 20. Defendant Drackert is a white female citizen of the United States and resident of Illinois who at all relevant times was a Guidance Counselor

employed at MCHS. She engaged in conduct complained of in the course and scope of her employment acting under her authority as an employee of Marian Catholic High School and under color of state law. *Id.* at Para. 6. Defendant Drackert directed the mandatory drug-screening program. *Id.* at Para. 26.For its part, Omega Laboratories is a biotechnology company that provides drug testing services for businesses and schools, including MCHS. *Id.* at Para. 17. Omega also received federal financial assistance in 2016. *Id.* at Para. 18. Omega holds itself out as an expert in the field of hair testing for drugs of abuse and controlled substances, and advertises and solicits business to provide said services. *Id.* at Para. 200.

Plaintiff Tenyiah Patterson is the next friend and parent of minor L.P. Plaintiff Janice Stevenson is the next friend and parent of minor, I.J. Plaintiff Nikia Cannon is the parent and next friend of minor J.H. Plaintiff Sharon Fry is the parent and next friend of minor J.B. Rhonda Campbell is the parent and next friend of minor CC. Michele Robinson is the next friend and parent of minor J.R. Shane Ratkovich is white, 19 years old and suing on his own behalf. L.P., I.J., J.H., J.B., J.R., and C.C. are African-American. All plaintiffs are citizens of the United States and residents of Illinois. *Id.* at Para. 5..

At all relevant times, all plaintiffs were students at MCHS. *Id.* at Para. 21. MCHS had and has a mandatory drug testing program for all students and, per the MCHS policy, each student is screened for drug use at least one time. *Id.* at Para. 22. Plaintiffs paid tuition to MCHS and agreed to adhere to the drug-screening program as a precondition to their admission to MCHS. *Id.* at Para. 23-24. Plaintiffs naturally expected that they would have the opportunity to obtain a better education at MCHS, to participate in athletic and extracurricular activities through both the Suburban Catholic Conference and Illinois High School Association, and, most importantly, to be treated fairly by all of the educators and employees of MCHS. *Id.* at Para. 25.

Most critically, all Plaintiffs did not and do not use cocaine. *Id.* at Para. 31. After Omega Laboratories took Plaintiff's hair samples at MCHS in Illinois, it sent the hair samples to Omega in Ohio, ran laboratory tests and then returned the results back to Plaintiff. According to the Omega lab results, Plaintiffs all tested positive for cocaine and its main metabolite benzoylecgonin. *Id.* at Paras. 27-30. After the Omega tests came back positive (despite Plaintiffs having never used cocaine) Plaintiffs had subsequent tests taken at various facilities which were not MCHS or Omega. *Id.* at Para. 32. All of those tests were negative for cocaine. *Id.* at Para. 32. The sequence of testing and results are outlined below:[1]

- Plaintiff I.J.
    - 2014-2015 school year: all drug test results were negative
    - 9/28/15 – took test given by Omega
    - 10/8/15 – Omega reported hair tested positive for cocaine
    - 10/12/15 – took test given by Quest Diagnostic
    - 10/13/15 – Quest reported negative for drugs
    - Currently – MCHS still requiring drug testing
- Plaintiff J.B.
    - 10/26/15-took test given by Omega
    - 11/5/15-Drackert reported hair tested positive for cocaine and questioned JB whether or not parents used or sold drugs at home
    - 11//5/15-took test given by Omega
    - 11/6/15-took test given by Franciscan Physician ("FP") network
    - 11/7/15 FP reported negative for drugs
    - 11/10/15 took test given by Quest Diagnostics
    - 11/12/15 Quest reported negative for drugs
    - 11/23/15 Omega reported 11/5 test was negative for drugs
- Plaintiff J.H.
    - Fall of 2014 – Omega reported hair tested positive for cocaine
    - One day later – Omega reported second hair tested positive for cocaine
    - 10/21/14 – JH compelled to attend drug abuse counseling
    - 1/9/15 takes another drug test given by Omega
    - 1/15/15 – Omega reported positive for cocaine
    - 3/4/15 – takes another drug test given by Omega
    - 3/12/15 – Omega reported positive for cocaine
    - 3/23/15-test given by Quest Diag.
    - 3/26/15- Quest reports negative for cocaine

---

[1] The facts concerning IJ are 1AC, Paras. 36-44, for JB, Paras. 45-60, JH, Paras 61-75, LP, Paras 76-104, CC Paras. 105-121, Ratkovich, Paras. 122-131 and J.R., Paras. 132-139.

- o March 2015 forced to withdraw from MCHS
- Plaintiff L.P.
  - o 10/21/14-LP selected for random drug test
  - o 11/20/14 takes Omega test
  - o 12/1/14-Omega reports positive for cocaine
  - o 12/6/14-LP given drug test by Advocate Healthcare
  - o 12/9/14 Advocate reports negative for cocaine
  - o 12/9/14-takes Omega drug test
  - o 12/15/14-Omega reports positive for cocaine
  - o 2/20/15 – takes Omega drug test
  - o 2/26/15 – Omega reports positive for cocaine
  - o 5/13/15 takes Omega test
  - o 5/21/15 Omega reports positive for cocaine
  - o 9/1/15 takes Omega test
  - o 9/11/15 Omega reports positive for cocaine
  - o 9/15/15 takes Quest Diagnostics test
  - o 9/17/15 Quest reports negative for cocaine
  - o 9/19/15 takes Advocate Health. Test
  - o 9/22/15 Advocate reports negative for cocaine
  - o Approx. 9/30/15 LP forced to withdraw from MCHS
- Plaintiff C.C.
  - o 1/25/16 – Omega gives drug test using head hair
  - o 2/8/16 – Omega reports positive for cocaine
  - o 2/8/16 – takes Univ. of Chicago test, which was negative for cocaine
  - o 2/9/16 takes Quest Diagnostics test using head hair
  - o 2/9/16 takes Omega test using head hair
  - o Subsequently, Omega reports 2/9 test was positive for cocaine and Quest reports 2/9 test was negative for cocaine.
  - o C.C. scheduled to be retested on May 9, 2016.
- Plaintiff J.R.
  - o 10/14 Omega reports positive for cocaine
  - o J.R. forced to attend drug counseling
  - o 1/9/15 JR received test result from Redwood Toxicology that was negative for cocaine.
- Plaintiff Ratkovich
  - o Spring 2013 - given a drug test and received a false positive from Omega Laboratories
  - o Approximately June 11, 2013, takes drug test administered by Quest Diagnostics, which was negative for all drugs.
  - o On July 2, 2013, takes another drug test administered by Omega and that test was positive for cocaine and benzoylecgonine.
  - o MCHS expelled Ratkovich and he was not given an opportunity to contest his false positives.

Ratkovich was not the only student who faced harsh consequences as a result of the false positive. MCHS forced other plaintiffs to withdraw from the school, or take drug counseling classes, even though they adamantly denied using drugs, were athletes and/or and participated in extracurricular activities, and presented drug test results which were negative for drug use. Defendant Drackert ignored evidence that the Omega-run drug tests were faulty and ignored evidence that other lab test results (from Advocate Healthcare, Quest Diagnostics, Franciscan Physician, etc.), which were negative for cocaine, were accurate. 1AC, Paras. 144, 145, 173, 184.

Lastly, Plaintiffs allege that MCHS students who were not African-American, who also tested positive for cocaine usage, were allowed opportunities to re-test immediately, to have hair taken from their legs or other parts of their body (as opposed to their heads) and were not sent to drug counseling and/or not expelled from MCHS. *Id.* at Para. 34. Research and studies indicate that hair testing for drugs is flawed in that the nature of the protocols negatively impacts the accuracy of the results; specifically, hair-testing protocols must account for texture of hair, products used on hair samples, and the handling of samples prior to testing, how samples are collected and processed and standards of testing. *Id.* at Para. 35.

On December 14, 2015, Plaintiffs filed their complaint on behalf of I.J., L.P., J.H., and J.B seeking money damages and equitable relief. Dkt. 1. Defendants Marian Catholic High School and Joanna Drackert filed a motion to dismiss all claims, and supporting memorandum of law. Dkt. 29 and 30. Defendant Omega Laboratories filed a motion to dismiss all claims against it and filed a supporting memorandum of law. Dkt. 27 and 28. After Plaintiffs were given leave to file their First Amended Complaint, this Court set a briefing schedule, with Plaintiffs' responses due March 29, 2016. Dkt. 41. On March 15, 2016, Plaintiffs filed their First Amended Complaint,

adding three additional plaintiffs, one additional defendant, and one additional claim. The First

Amended Complaint contains the following claims and parties:[2]

| Claim | Plaintiffs | Defendants |
|---|---|---|
| I - 1981 Race Discrimination | L.P., J.H., I.J., J.B., C.C., and J.R. | MCHS, Joanna Drackert, Dominican Sisters Omega Laboratories |
| II - Title VI – Race [federal funds] | L.P., J.H., I.J., J.B., C.C., and J.R. | MCHS, Dominican Sisters |
| III - 1983 Equal Protection | All | Joanna Drackert |
| IV - 1983 Procedural Due Process | All | Joanna Drackert |
| V - 1985(3) Conspiracy based on race | L.P., J.H., I.J., J.B., C.C., and J.R. | MCHS, Joanna Drackert, Dominican Sisters, Omega Laboratories, Unknown employees of MCHS, Omega Laboratories and Dominican Sisters |
| VI - Negligent Training and Supervision | All | MCHS, Dominican Sisters |
| VII – IIED | All | MCHS, Dominican Sisters |
| VIII – Defamation | All | MCHS Joanna Drackert, Dominican Sisters, Omega Laboratories, Unknown employees of MCHS, Omega Lab. and Dominican Sisters |
| IX – Negligence | All | Omega Laboratories |
| X - Respondeat Superior | All | MCHS, Dominican Sisters |
| XI - Title II of Civil Rights Act of 1964 | L.P., J.H., I.J., J.B., C.C., and J.R. | MCHS, Dominican Sisters |

At the motion hearing on March 15, 2016, all Defendants agreed to rest on their initial briefs in

support of their motions to dismiss and, with respect to MCHS, an additional argument contained in

their response in opposition to Plaintiffs' motion for leave to amend the complaint. Accordingly, the

instant response addresses the arguments contained in those briefs.

## II.     Legal Standard

In determining whether to grant a Rule 12(b)(6) motion to dismiss, the court accepts as

true all well-pleaded allegations in the complaint, and draws all reasonable inferences in the light

---

[2] Although initially named, Plaintiff voluntarily dismissed the Archdiocese of Chicago. Dkt. 26.

most favorable to the plaintiff. *Killingsworth v. HSBC Bank*, 507 F.3d 614, 618 (7th Cir. 2007). The federal notice pleading standard requires only that "a complaint state the plaintiff's legal claim… together with some indication ... of time and place." *Thomson v. Washington*, 362 F.3d 969, 970-71 (7th Cir. 2004). A court will grant a motion to dismiss only if the plaintiff cannot prevail under any set of facts that could be proven consistent with the allegations. *Forseth v. Village of Sussez*, 199 F.3d 363, 368 (7th Cir. 2000).

The Seventh Circuit summarized the requirements of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, and *Iqbal v. Aschroft*, 129 S.Ct. 1937 (2009), condensing them into three elements: (1) a plaintiff must give notice of his claims to the defendants; (2) the court must accept the factual allegations in plaintiff's complaint as true unless they are so vague or improbable that they do not give the defendant notice of the claims; and (3) conclusory allegations and bare recitations of the elements of a claim are unacceptable. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Plaintiffs still need not plead detailed factual allegations. *Iqbal*, 129 S.Ct. at 1949.

## III. Defendants Drackert and MCHS's Motion to Dismiss Should Be Denied In Its Entirety

### 1. Plaintiffs Have Alleged a Plausible Theory of State Action

Plaintiffs have plausibly alleged that Defendant Drackert is a state actor for purposes of their 1983 claims. All that is required at the pleadings stage is plausibility, and Plaintiffs have pled plausible facts in regard to state action to justify discovery into state action, such as the relationship between Drackert, MCHS, Dominican Sisters and the U.S. Department of Education federal funding they applied for and received in order to run drug tests on high school students. To be sure, the taxpayer money granted to MCHS and Dominican Sisters is being used to conduct mandatory, suspicion-less drug testing of all high school students, apparently at the behest of the Department of Education. See *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 830-32 (7th Cir. 2009) (discovery needed to determine the relationships between the private

actors and the state in order to determine whether their actions can be attributed to the state); *Stubenfield v. Chicago Housing Authority*, 6 F. Supp. 3d 779, 784 (N.D. Ill. Nov. 26, 2013) (court found ample facts from which to draw a reasonable inference that there was state action, at least sufficient to survive dismissal and permit discovery).

 For at least 8 years, MCHS, and its employee, Joanna Drackert, have been using federal funds to administer a drug-testing program for all of the students at the school. In fact, MCHS and Dominican Sisters applied for such funds for exactly that purpose. Defendants' only argument in favor of dismissal of Plaintiffs' Section 1983 claims is that Plaintiffs have not alleged sufficient state action. At this stage of the proceedings, Defendants' argument must fail.

At the outset, Defendants' reliance on *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) is misplaced. MCHS and Defendant Dominican Sisters applied for, and received, a grant from the U.S. Department of Education for a Safe and Drug-Free Schools and Communities program to run a drug-screening program. MCHS and the Dominican Sisters use the authority of the Department of Education to drug test students. The entanglement is such that it is plausible that MCHS and Drackert are acting under the color of state law. That was not the case in *Rendell-Baker*, which was an employment discrimination claim against a school which happened to receive federal funds.

The determination of whether a private entity is a state actor is "necessarily a fact-bound inquiry." *Brentwood Academy v. Tennessee Secondary School Athletic Association, et* al., 531 U.S. 288, 298 (2001). "[S]tate action may be found if, though only if, there is such a 'close nexus between the state and the challenged action' that seemingly private behavior 'may be fairly treated as that of the state itself." *Id.* at 295 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)). "[T]he purpose of the requirement is to assure that constitutional standards are invoked only when it can be said that the state is responsible for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky et al.*, 457 U.S. 991, 1004 (1982).

Here, to be sure, the state is responsible for the conduct of which plaintiff complains: the federal government gave MCHS and Dominican Sisters the money to administer a drug testing program to all of its students, and then MCHS administered that program.

The relationship/nexus/entanglement/entwinement between the state and the private entity must be on the precise issue of which the plaintiffs complain, i.e., here, the drug testing policy.[3] The Seventh Circuit pointed to four "tests" or "discernible situations" where the court will find state action despite the presence of a private party: (1) "symbiotic relationship" between the private actor and the State (*Burton*, 365 U.S. 715, 721 (1961)); (2) the "nexus test" where the State commands or encourages the private discriminatory action (*Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982)); (3) when a private party carries on a traditional public function; and (4) when the involvement of governmental authority aggravates or contributes to the unlawful conduct. *Airline Pilots Assoc'n (ALPA)*, 45 F.3d at 1149. Here, U.S. Department of Education, through its Safe and Drug Free Schools and Communities program, makes financial assistance available so that educational agencies such as MCHS can afford to administer drug tests to its students. It is a fair inference that in applying for the government grant, MCHS must abide by certain conditions and requirements to both win that grant and continue receiving grant money; effectively, the State directs and controls MCHS's decisions regarding its drug testing program.

In sum, there is a reasonable inference that Defendant Drackert is acting under color of law, both by the use of specific federal funding and through the authority and benefits granted by

---

[3] In one case, the Seventh Circuit characterized the determination of whether private behavior is state action as articulated in Supreme Court precedent not as a test so much as a series of examples in a fact-based inquiry. *Hallinan v. Fraternal Order of Police of Chicago*, 570 F.3d 811, 815 (7th Cir. 2009). The court in *Hallinan* lists the following examples: when private actors conspire or are jointly engaged (*Dennis v. Sparks*, 449 U.S. 24, 27-8 (1980)); where a state compels discriminatory action; when the state controls a nominally private entity; when it is entwined with its management and control (*Evans v. Newton*, 382 U.S. 296, 299 (1966); when the state delegates a public function to a private entity; when there is such a close nexus between the state and the challenged action that seemingly private behavior reasonably may be treated as that of the state itself. *Id.*

registering with the State of Illinois, such that the nexus between Drackert and the State itself could not be closer. Defendants do not raise any other grounds for dismissal of the equal protection and procedural due process claims. Accordingly, Defendants have waived any other additional arguments. Because Plaintiffs' allegations are plausible, Counts III and IV should go forward.

## 2. Plaintiffs Have Alleged Viable Section 1981 and Title VI Claims Against Drackert

Plaintiffs' claims under Section 1981 and Title VI are viable and should not be dismissed. Defendants' arguments reflect a misapprehension of Plaintiffs' allegations. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d. To state a claim under Title VI, plaintiffs must allege facts satisfying two elements: (1) that they have been intentionally discriminated against on the grounds of race; and (2) that defendants are recipients of federal financial assistance. *Irving v. Pui Tak Ctr.*, No. 12 C 8092, 2013 WL 2251757, at *2 (N.D.Ill. May 22, 2013). To adequately plead discrimination a plaintiff must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams*, 742 F.3d at 727(citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Here, Plaintiffs have made plausible allegations that MCHS and Dominican Sisters receive federal financial assistance and discriminated against Plaintiffs because of their race by failing to provide due process or allow Plaintiffs any chance to contest the Omega test results, by Drackert accusing Plaintiffs' family members of using or selling drugs, by Drackert referencing Plaintiffs' African-American hairstyles (including an "Afro" and dreadlocks), and by allowing non-African-American students a different procedure to contest the false positive test results.

Under a Section 1981 *prima facie* case of racial discrimination, the plaintiff must allege that he is (1) a member of a racial minority; (2) the defendants had the intent to discriminate on

the basis of race; and (3) the discrimination concerned the making or enforcing of a contract. At the motion to dismiss stage, a complaint "need not allege facts in support of each element, and it is sufficient if it alleges that the employee was discriminated against because of her race." *Reyes v. North Park University,* *4 2012 WL 6720527 (N.D. Ill., Dec. 27, 2012) (citing *Huon v. Johnson & Bell, Ltd.,* 2012 U.S. Dist. LEXIS 74176, at *18,2012 WL 1932120 (N.D.Ill. May 23, 2012). Detailed allegations are not required under notice pleading. Here, as to both counts, Plaintiffs have alleged that they are racial minorities (African-American), that the Defendants MCHS, Dominican Sisters  and Drackert had the intent to discriminate based on their race by taking the actions outlined in the paragraph directly above, and that MCHS and Dominican Sisters received federal funds. Additionally, contrary to Defendants' assertions, Plaintiffs do identify the contractual right at issue: Plaintiffs pay or paid tuition to MCHS in return for education, educational enrichment, and character development. 1AC, Para. 141.

Furthermore, Defendants' own case law undercuts their position. Defendants cite a recent Seventh Circuit case, *McReynolds v. Merrill Lynch*, 694 F. 3d 873, 886 (7th Cir. 2012) for the proposition that plaintiffs need to plead "*factual* allegations to support a reasonable inference of discriminatory intent." (citing *Iqbal*, 556 U.S. at 679) (emphasis in original). That is exactly what Plaintiffs have done. Drackert's comments that Plaintiffs or their families use or sell drugs at home and that Omega never makes mistakes, combined with Drackert's willful turning a blind eye to Plaintiffs producing negative drug test results and to the fact that there were at least six African-American students who alleged that the Omega lab test results were inaccurate, support a reasonable inference that she intended to discriminate against Plaintiffs because of their race.

Finally, Defendants misconstrue Plaintiffs' allegations. Although Plaintiffs contend that there are flaws in the way Omega performs its drug tests, and in its performance of hair drug

testing for African-Americans generally, Plaintiffs' racial discrimination claims arise from how Drackert and MCHS treated them after the false positive test results were revealed. The *McReynolds* decision centered on the fact that the plaintiffs there pled no other allegations concerning defendants' intentional discrimination other than the <u>general</u> claim that "the defendant intentionally designed the retention program based on production levels that incorporated the effects of past discrimination, and that the firm did so to discriminate against black brokers." *Id.* at 886-887. The Seventh Circuit rightfully rejected such a legal conclusion. But, the facts here are dissimilar. Plaintiffs did not plead legal conclusions. In fact, Plaintiff alleges that white students were allowed to test in different ways, and that certain non-African-American students, who also testified positive for cocaine, were allowed opportunities to re-test immediately, have hair taken from other parts of their body, and were not immediately sent to drug counseling classes and/or expelled from MCHS. 1AC, Para. 34. Again, Plaintiffs allege that Drackert willfully ignored contradictory and exculpatory test results, instead insisting that Plaintiffs or their families used or sold drugs; it is a plausible inference that Drackert's behavior was due to Plaintiffs' race. *McReynolds* does not apply here.

Lastly, Defendants disingenuously argue that "subsequent testing of Plaintiffs after they tested positive cannot be discriminatory because there is no allegation that Marian Catholic had any knowledge of a problem with the drug testing methodology." Dkt. 30, p. 7. On the contrary, Defendants had numerous opportunities to become aware that there was a problem with the drug testing program, e.g. in December of 2014, when LP presented test results from Advocate Healthcare which were negative, or when LP's parents complained about the way the tests were administered, or when other students started presenting conflicting test results for the approximately same time period, or even know, when seven students have come forward stating

that the Omega test results were wrong. At this stage of the proceedings, where all inferences must be drawn in Plaintiffs' favor, Defendants cannot escape the most reasonable inference there is: Plaintiffs maintained that they did not use cocaine and received test results from different laboratories which were negative for cocaine because those non-Omega tests were right - Plaintiffs did not use cocaine. With that inference in Plaintiffs' favor, the discrimination became clear: Defendant Drackert, after receiving the test results from Omega labs for the Plaintiffs, intentionally discriminated against them, re-tested them, defamed them in front of classmates, sent them to drug counseling programs, and, in certain instances, forced them to withdraw from the school, because they were African-American.

Finally, Defendant state, but do not cite any case in support of the proposition, that Title VI requires that Marian Catholic received federal funding in 2014 or 2015. Defendants' unsupported argument should be deemed waived. In sum, as Judge Shadur stated in *Ali v. Village of Tinley Park*, all well-pleaded allegations are not only to be treated as gospel for Rule 12(b)(6) purposes but are to get the benefit of favorable inferences. *Ali v. Village of Tinley Park* , 79 F. Supp. 3d 772, 777 (N.D. Ill. Jan. 7, 2015). Indeed, "plausibility does not mean probability." *Id.* (citing *Twombly*, 550 U.S. at 556). With respect to their Title VI and Section 1981 claims, Plaintiffs have raised plausible allegations, supported by facts and favorable inferences, that Defendants Drackert, MCHS and Dominican Sisters intentionally discriminated against them because they are African-American, and the claims should not be dismissed.

### 3. Plaintiffs Have Sufficiently Alleged a Section 1985(3) Conspiracy

Plaintiffs have sufficiently alleged a plausible conspiracy claim against Defendants. "The elements of a claim under § 1985(3) are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws ....; (3) an act in furtherance of the conspiracy; (4) whereby a person is ... deprived of any right of a citizen of

the United States." *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 1999) (internal quotation marks omitted). "[A] plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). Also, the "conspiracy must be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Britt v. Garcia*, 457 F.3d 264, 270 n.4 (2d Cir. 2006). "[I]t is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date…" *Walker v. Thompson*, 288 F.3d 1005, 1007–08 (7th Cir.2002). *See also Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir.2003); *Tierney v. Vahle*, 304 F.3d 734, 740 (7th Cir.2002).

Here, Plaintiffs indicated the timeframe (beginning in 2014 and continuing to the present), the parties (MCHS, Drackert, Dominican Sisters, Omega and as yet unknown employees of MCHS, Omega and Dominican Sisters ), and the purpose (target, falsely accuse and/or remove African-American students from MCHS). See 1AC, Paras. 172-175. Plaintiffs also alleged that the conspiracy was motivated by racial discrimination, in which defendants agreed to pursue drug use accusations, despite inconsistent and exculpatory testing, to subject African-American students to more than the required annual drug testing and to threaten dismissal for J.B., J.R., C.C. and I.J., and actually dismiss J.H. and L.P. *Id.* at Para. 173.

Defendants appear to argue that the intracorporate conspiracy doctrine shields them from a Section 1985 Conspiracy claim. This is not true. The doctrine does not apply where, as here, employees of the same entity conspire to engage in illegal and/or unconstitutional acts--some of which were outside the scope of their authority. All members of a civil conspiracy are liable for the foreseeable conduct of the other members of the conspiracy. *See, e.g., In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 616 (7th Cir.1997) (defendant could be

held jointly liable for later acts of co-conspirators where it did not withdraw from conspiracy); *Hoffman–La Roche, Inc. v. Greenberg*, 447 F.2d 872, 874 n. 2 (7th Cir.1971) (parties to a civil conspiracy are jointly and severally liable for injuries to plaintiff); *see also, e.g., Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 697 (D.C.Cir.2009). Most importantly here, the "intracorporate conspiracy" doctrine precludes conspiracy claims against members of the same entity if the allegations involve conduct entirely within the scope of their authority. *Payton v. Rush–Presbyterian–St. Luke's Med. Ctr.*, 184 F.3d 623, 632 (7th Cir.1999). "The intracorporate conspiracy doctrine was created to shield corporations and their employees from conspiracy liability for routine, collaborative business decisions that are later alleged to be discriminatory." *Newsome v. James*, No. 96 C 7680, 2000 WL 528475, at *15 (N.D.Ill. April 26, 2000). Targeting African-Americans for additional drug testing, sending them to substance abuse counseling in spite of inconsistent and exculpatory test results, and forcing dismissal of certain students is not within the scope of the employment of all MCHS, Dominican Sisters or Omega employees.

In sum, Plaintiffs have put Defendants on notice as to the conspiracy claim against them and the intracorporate conspiracy doctrine does not apply. Count V should not be dismissed.

### 4. Plaintiffs State a Claim for Negligent Training and Supervision Against Marian Catholic High School

Under Illinois law, a claim for negligent supervision must allege: (1) the employer had a duty to train and/or supervise its employees;(2) the employer negligently trained and/or supervised an employee; and (3) the employer's negligence proximately caused the plaintiff's injuries. *Van Horne v. Muller,* 294 Ill.App.3d 649, 691 N.E.2d 74, 79 (1998), *rev'd in part on other grounds,* 185 Ill.2d 299, 705 N.E.2d 898 (1999). For an employer to be liable for negligent supervision, "it must be established that the employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer,

having this knowledge, failed to supervise the employee adequately, or take other action to prevent the harm." *Doe v. Brouillette,* 389 Ill.App.3d 595, 906 N.E.2d 105, 115–16 (2009) (internal quotations and citations omitted). Here, Plaintiffs have alleged all of these elements: MCHS and Dominican Sisters had a duty to supervise; MCHS and Dominican Sisters breached that duty when they failed to properly train and supervise Defendants Drackert and Omega; that failure to train and supervise was the proximate cause of Plaintiffs' injuries.

Plaintiffs also address the arguments made by MCHS and Drackert. First, contrary to Defendants' assertions, Plaintiffs identify the conduct at issue: Plaintiffs allege that MCHS and Dominican Sisters allowed its employees and agents to make racist and offensive comments about students and their parents (the comments themselves are reflected in paragraphs 40, 49, 59, 63, 69, 78-79, 82, 87-92), allowed the misconduct to continue after Plaintiffs complained, continued to use and rely on drug testing which resulted in false positives and failing to adequately train its employees and agents (including, but not limited to, Drackert and Omega) in properly giving and interpreting drug tests. 1AC, Para. 179. Second, Defendants disingenuously argue that Plaintiffs' allegations show that Marian Catholic "had no knowledge of a particular unfitness by Drackert because they [plaintiffs] allege that when Sister Judine received a complaint about Drackert on December 21, 2014, she insisted that Marian Catholic had never received a complaint about Drackert in the past." Dkt. 30, p. 10. Defendants again impermissibly take an inference in their favor. The fact that Plaintiffs complained to Sister Judine, an employee of MCHS and Dominican Sisters, on December 21, 2014, shows that MCHS and Dominican Sisters were aware of Drackert's unfitness at least as early as then.

Additionally, Defendants' arguments concerning a negligent supervision and training claim against MCHS and Dominican Sisters for actions of their agent, Omega Laboratories, also

fail. See Dkt. 30, p. 11. First, Plaintiffs do allege that MCHS knew of a problem with the drug testing methodology, at least as early as July of 2013 when Plaintiff Ratkovich presented an inconsistent result. Second, there are scientific issues with hair testing, which MCHS knew about or should have known about, given that plaintiffs were complaining about the faulty drug tests. Finally, Plaintiffs' allegation that Drackert and Omega did not properly give and interpret drug tests is supported by the allegation, which this Court must accept as true, that Plaintiffs did not, at any time, use cocaine. If the Omega test results were positive for cocaine, and Plaintiffs had not used cocaine, then the test results were false and test procedures were flawed. Plaintiffs have a plausible claim against MCHS and Dominican Sisters, and Count VI should not be dismissed.

**5. Plaintiffs State a Viable Claim for IIED**

Plaintiffs have sufficiently pled an intentional infliction of emotional distress claim against Defendant Drackert. To assert a claim for IIED, a plaintiff must establish: (1) the defendant's conduct was extreme and outrageous; (2) the defendant intended or recklessly disregarded the probability that the conduct would cause the plaintiff to suffer emotional distress; and (3) the conduct in fact caused severe emotional distress. *Swearnigen-El v. Cook County Sheriff's Dept.*, 602 F.3d 852, 864 (7th Cir. 2010) (*citing Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d at 21, 607 N.E.2d 201, 211 (Ill. 1992)). Defendants concede that Plaintiff has met the second element because they offer no argument on that element.

Here, Plaintiffs have alleged sufficient extreme and outrageous behavior to meet the first element. Extreme and outrageous behavior requires conduct that goes beyond all possible bounds of decency, such that a reasonable person would hear the facts and be compelled to feelings of resentment and outrage. *Duffy*, 2012 IL App (1st) at ¶ 36, 981 N.E.2d at 1079 (*citing Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211, 154 Ill.2d at 21 (Ill. 1992)). Drackert's conduct includes the following: falsely accusing Plaintiffs of engaging in substance abuse,

subject Plaintiffs to multiple, unnecessary drug tests over the span of several months, blatantly disregarding the results of tests which came back negative, repeatedly threatening Plaintiffs' removal from MCHS, and continuing to subject African-American students to unwarranted drug tests and continued involvement in unnecessary drug treatment programs. 1AC, Para. 184. Additionally, and merely by way of example, defendant Drackert told J.B., in front of and in earshot of several classmates, that "this means it's on its way out of your system" (1AC, Para. 59), forced Plaintiff LP to withdraw from MCHS despite months of inconsistent and indeterminate testing (1AC, Para. 103), and accused Plaintiff J.R. of having drugs at home, despite his protests that he had not used cocaine and neither he nor his parents had drugs at home (1AC, Para. 137-138). In short, Drackert's conduct rose to the level of extreme and outrageous. Importantly, Illinois cases have also noted the principle, stated in the Second Restatement of Torts, that "[s]evere distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." *Wall v. Pecaro,* 561 N.E.2d 1084, 1088; *see also Kolegas v. Heftel Broadcast. Corp.,* 607 N.E.2d 201, 213. These cases have acknowledged that, even when substantial evidence was not presented as to the severity of distress, the very nature of the conduct involved may be evidence of its impact on the victim. For example, in *Bristow v. Drake Street Inc*., 41 F.3d 345, 350 (7th Cir. 1994), the Seventh Circuit noted that Illinois courts have "tended to merge the issue of the outrageousness of the defendant's conduct with the issue of the severity of the plaintiff's emotional distress, in effect requiring more evidence of outrageousness the weaker the evidence of distress." (internal citation omitted). Further, teachers and guidance counselors are a prime example of the type of individuals who in exercising their authority can become liable for

extreme abuses of their positions. *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 90, 360 N.E.2d 765, 767 (1976) and Restatement (Second) of Torts Ch. 46 comment e (1965).

Finally, Defendants discount the allegations of Plaintiffs' emotional distress as "fear and worry, which do not qualify as severe emotional distress under Illinois law." Dkt. 30, p. 12. Defendants' first misstep is to hold Plaintiff to a fact-pleading standard, which is not required in federal court. They also ignore the distress that each Plaintiff, all of whom were a) minors and b) being falsely accused of using drugs, suffered emotional distress, including but not limited to, anxiety, humiliation, embarrassment, stress, and crying. In Illinois, "the emotional distress required to support the cause of action must be so severe that no reasonable person could be expected to endure it." *Adams v. Sussman and Hertzberg*, *Ltd*., 292 Ill. App. 3d 30 38-39, 684 N.E. 2d 935, 941 (Ill. App. Ct. 1997) (internal citations omitted). Importantly, the Seventh Circuit commented that "[o]bviously, this is not a bright-line test." *Bristow v. Drake Street Inc*., 41 F.3d 345, 349 (7th Cir. 1994). Indeed, the Seventh Circuit also held that "there is no fixed threshold of severity that purely emotional or psychological distress must cross in order to make the defendant's conduct actionable." *Id.* At this stage, Plaintiffs are not required to plead every symptom of severe emotional distress which they have suffered as a result of Defendant Drackert's conduct; Plaintiffs have put Defendants on notice as to a plausible IIED claim against them. Plaintiff's claim for intentional infliction of emotional distress should not be dismissed.

### 6. Plaintiffs State a Claim for Defamation

With respect to Plaintiffs' defamation claim, Defendants only argue that they have a defense to the defamation claim because Drackert's defamatory statements were true. But, Plaintiff does not allege that Drackert said that L.P. and J.B. each failed drug tests. In fact, Drackert's statement to J.B. in the school regarding a second Omega drug test that was negative that "this means it's on its way out of your system" was false; J.B. did not use cocaine so it was impossible that cocaine was on its

way out of her system (1AC, Para. 59). Similarly, Drackert's statement to L.P.'s mother and mother's employees that Plaintiff was "using drugs" is also false; LP did not use cocaine (1AC, Para. 82(c)).

Defendants also argue that Plaintiffs were required to identify who the relevant third party is. In fact, Plaintiff did identify the third parties: Drackert called Patterson and talked to individuals employed by her; similarly, Drackert told J.B.'s classmates that "this means it's on its way out of your system." Unlike the case at bar, the plaintiff in *Thompson v. Village of Monee*, 2013 WL 3337801 had referred only to a "third party" and did not provide any additional identifying information. *Id.* at *24. Plaintiffs can find no law for the proposition that they must identify exactly to whom a statement is published. Plaintiffs request that this Court deny the motion as to Count VIII.

### 7. Plaintiffs' Claim for Respondeat Superior Against MCHS Is Viable

Because Plaintiffs' claims for IIED and defamation are viable, Plaintiffs' claim for *respondeat superior* against MCHS is also viable.

### 8. Plaintiffs State a Viable Title II Public Accommodations Claim Against MCHS

Defendants cite non-precedential cases in support of their argument that Title II does not apply to schools. See Defendants' Brief In Opposition to Plaintiffs' Motion for Leave To File An Amended Complaint, Dkt. 40, pp. 6-7. In fact, however, Plaintiffs have been unable to find any case from this district or Circuit concerning the applicability of Title II to a school which accepted and continues to accept federal funding, is a member of the Illinois High School Association, is registered with the Illinois NonPublic Elementary and Secondary School Registration and Recognition, and holds itself open for admission to students in two states. For those reasons, Title II applies to MCHS and Plaintiffs' public accommodations claim should proceed to discovery.

Title II of the Civil Rights Act of 1964 prohibits discrimination in public accommodations. 42 U.S.C.A § 2000a. The statute provides for equal access to the full enjoyment of the goods, services, facilities, privileges, advantages and accommodations of any

place of public accommodation as defined in the statute, without discrimination on the ground of race. *Id.* at (a). Title II excepts "private club or other establishment not in fact open to the public  except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b) of this section.." See *Id.* at (e). In another federal statute, however, the Americans with Disabilities Act, 42 U.S.C.A. Section 12, 181, Congress delineated the scope of the term "accommodation" to specifically include schools: (7) Public Accommodation….(J) a nursery, elementary, secondary, undergraduate or postgraduate private school, or other place of education."

In this case, Defendants take language from *Runyon v. McCrary* out of context. In fact, the entire footnote, although dicta, actually favors the inclusion of a school such as MCHS. There, the Court noted that the private club exemption, if applicable at all, comes into play only if the establishment is not in fact open to the public. The Court then discusses that that schools advertised in the Yellow Pages and used mass mailings to attract students. Finally, the Court quoted approvingly language from the appellate decision and further discussed Title II:

 "these schools are private only in the sense that they are managed by private persons and they are not direct recipients of public funds. Their actual and potential constituency, however, is more public than private. They appeal to the parents of all children in the area who can meet their academic and other admission requirements. […] The pattern of exclusion is thus directly analogous to that at issue in *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229 and *Tillman v. Wheaton-Haven Recreation Assn.,* 410 U.S. 431 where the so-called private clubs were open to all objectively qualified whites I. e., those living within a specified geographic area. Moreover, it is doubtful that a plausible "implied repeal" argument could be made in this context in any event. Implied repeals occur if two Acts are in irreconcilable conflict. *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154-55. Title II of the Civil Rights Act of 1964, of which the "private club" exemption is a part, does not by its terms reach private schools. Since there would appear to be no potential for overlapping application of s 1981 and Title II of the 1964 Act with respect to racial discrimination practiced by private schools, there would also appear to be no potential for conflict between s 1981 and Title II's "private club" exemption in this context. See Note, The Desegregation of Private Schools: Is Section 1981 the Answer?, 48 N.Y.U.L.Rev. 1147, 1159 (1973).

*Runyon v. McCrary*, 427 U.S. 160, 172 n. 10 (1972) (internal citations and quotations omitted).

MCHS cannot simply call itself a private school and hope to hide behind the "private club"

exception to Title II. Given that MCHS advertises to all students in two states, receives federal

funding, and participates in state-sanctioned associations, MCHS, in effect, is more public than

private and can thus be considered a public accommodation, governed by the prohibitions of

Title II of the Civil Rights Act of 1964. Plaintiffs' Title II claim should not be dismissed.

## IV. Defendant Omega Laboratories' Motion to Dismiss Should Be Denied In Its Entirety

As an initial matter, Plaintiffs clarify that only four claims are pending against Omega

Laboratories: Count I (Section 1981 claim), Count V (1985(3) Conspiracy claim), Count VIII

(Defamation), and Count IX (Negligence). Plaintiffs address each claim in turn.

### 1. Plaintiffs Allege Intentional Discrimination Against Omega Laboratories Sufficient for a Section 1981 Racial Discrimination Claim

For the same reasons argued above, Plaintiffs' claim under Section 1981 is also viable as to

Defendant Omega. Plaintiffs have alleged that Omega discriminated against Plaintiffs because they

are African-American, that the testing is flawed and that the tests themselves fail to meet proper

protocols. Thus, the Section 1981 claim against Omega should not be dismissed.

### 2. Plaintiffs' 1985(3) Conspiracy Claim Is Viable

For the same reasons outlined above, in the section addressing Marian Catholic and

Drackert's arguments in support of their motion to dismiss the 1985(3) conspiracy claim,

Defendant Omega Laboratories' argument also fails. See supra Section III, subsection 3.

Additionally, Defendants' reliance on *Stevens v. Tillman*, 855 F. 2d 394, 404 (7th Cir.

1988) is misplaced. Plaintiffs do identify federally and constitutionally protected rights – the

right to equal protection and procedural due process, the rights to make and enjoy the benefits of

contracts the same as white citizens, under Section 1981, and the right to be free from racial

discrimination by an institution which receives federal funds under Title VI. Omega Laboratories

and its unknown employee(s) along with MCHS and Dominican Sisters' employees were

engaged in the same conspiracy to target Plaintiffs Defendant Omega is on notice as to the

claims against it and that is all that is required at this stage of the proceedings.

3. **Even if Omega Laboratories Has an Affirmative Defense of Qualified Privilege, Plaintiffs Allege a Plausible Defamation Claim Because Omega Abused the Privilege**

Omega raises the affirmative defense that it had a qualified privilege to report the results

of the tests given to Plaintiffs because it was an agent of MCHS. Even if this privilege applies,

there is a reasonable inference that Omega abused the privilege when it continued to report test

results despite the scientific studies regarding African-Americans and drug tests and the fact that

Plaintiffs had complained about the drug test results being faulty and presented different drug

test results, which were negative for cocaine. Once a defendant has established a qualified

privilege, a communication is actionable only if the plaintiff can show the defendant abused the

privilege. *Parker v. House O'Lite Corp.,* 258 Ill.Dec. 304, 756 N.E.2d 286, 296–97. (2001).To

satisfy this burden, the plaintiff must present evidence of a "reckless act which shows a disregard

for the defamed party's rights, including the failure to properly investigate the truth of the matter,

limit the scope of the material, or send the material to only the proper parties." *Kuwik v.

Starmark Star Mktg. & Admin., Inc.,* 188 Ill.Dec. 765, 619 N.E.2d at 136. (1993). The issue of

whether a privilege was abused ordinarily is question of fact. *Vickers v. Abbott Labs,* 241 Ill.Dec.

698, 719 N.E.2d at 1110. (1999). At the very least, in this case, Plaintiffs have sufficiently

alleged facts which raise a plausible inference that Defendant Omega abused its privilege.

Further, Omega raises, in a footnote, that claims based on drug test results reported before

December 14, 2014 are barred by the statute of limitations. Not so. The limitations period for the

claim of an injured minor begins to run from the date that the injured minor reaches majority, age 18. 735 ILCS 5/13-211. Plaintiffs should proceed to discovery on this count against Omega.

4.  **Plaintiffs Sufficiently Allege a Claim for Negligence**

Plaintiffs have stated a cognizable claim for negligence against Omega Laboratories. In order to state a claim for negligence under Illinois law, a plaintiff must allege that Defendant owed Plaintiff a duty of care, that Defendant breached that duty, and that Plaintiff was injured as a result of the breach. Here, Plaintiffs have plainly done so. Omega holds itself out as an expert in the field of hair testing for drugs of abuse and controlled substances, solicits business to provide such services, and had a duty to properly and accurately perform and report the results of its drug tests. 1AC, Paras. 200 and 202. Omega breached its duty in one of several ways by failing to properly and accurately perform and/or report the results of the drug tests given to Plaintiffs. Because Plaintiffs had not used cocaine at any time prior to being given the various drug tests by Omega, but Omega reported "positive" findings for cocaine, Omega breached its duty. *Id.* at Para. 203-204. Finally, Omega's breach of duty directly caused Plaintiffs to suffer damages, including but not limited to, expulsion from school, damaged reputation, humiliation and embarrassment.1AC, Para. 205. In a case with substantially similar allegations, Judge Dow held that Plaintiff stated a cognizable negligence claim against a drug testing company. *Cutler v. Quality Terminal Services, LLC*. 2009 WL 4674124, *4 (N.D. Ill. Dec. 4, 2009). Indeed, case law recognizes that a "drug-testing laboratory owes a duty of reasonable care to persons whose specimens it tests for employers or prospective employers." *Stinson v. Physicians Immediate Care, Ltd.,* 269 Ill.App.3d 659, 646 N.E.2d 930, 934 (2d Dist.1995); see also *Palonis v. Jewel Food Stores, Inc.,* 383 F.Supp.2d 1072, 1074 (N.D.Ill.2005).[4] A cause of action for negligently

---

[4]Part of the policy reasons behind Illinois and other jurisdictions finding that such a duty exists is because of the damage to an individual who faces a false-positive. See, e.g., *Elliott v. Laboratory Specialists,* Inc., 588 So. 2d 175,

performing a drug test has also been recognized against a hospital. *Kindernay v. Hillsboro Area Hosp.,* 851 N.E.2d 866 (Ill.App.Ct.2006).

Omega's attempts to dismiss Plaintiffs' well-pleaded negligence claim are unavailing. Omega first attempts to argue that Plaintiffs have advanced a failure to warn negligence theory, and then argue that Plaintiffs fail to state a claim under such a theory. Plaintiffs, however, do not advance a failure to warn theory. Defendant Omega then attempts to argue that what Plaintiffs are actually alleging is a negligent infliction of emotional distress claim. Dkt. 28, p. 13. This is also not correct and not reflected in Plaintiff's First Amended Complaint. Finally, Defendant Omega then attempts to argue that Plaintiffs' non-Omega drug test results are not a proper factual basis for a negligence claim against Omega. This argument is improper and irrelevant at the 12(b)(6) stage, where the only question is whether Plaintiffs have alleged a plausible claim for relief and put defendants on notice as to the duty owed and how the duty was breached..

### Conclusion

WHEREFORE, Plaintiffs request that this Court deny Defendants' Motions to Dismiss Plaintiffs' Complaint in their entirety, and for any other, additional relief this Court deems equitable and just.

Respectfully Submitted,

s/ Mary J. Grieb
Mary J. Grieb
Attorney for Plaintiffs
Shiller Preyar Law Offices
601 S. California Ave.
Chicago, IL 60612
312-226-4590

---

176 (5th Cir. 1991) ("the risk of harm in our society to an individual because of a false-positive drug test is so significant that any individual wrongfully accused of drug usage by his employer is within the scope of protection under the law."

**CERTIFICATE OF SERVICE**

Mary J. Grieb hereby certifies that a copy of the foregoing was served upon all opposing counsel via

the CM/ECF email system.


s/ Mary J. Grieb

Mary J. Grieb
Shiller Preyar Law Offices
601 S. California Ave.
Chicago, IL 60612
(312) 226-4590